UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
DALE PENNINGTON,

                            Plaintiff,

  - against -

PIERO D'IPPOLITO and CICINELLI &
D'IPPOLITO, CPA'S, P.C.,

                            Defendants.
-------------------------------------------------------------x

**OPINION & ORDER**

No. 18-CV-5799 (CS)

Appearances:
Patrick J. McHugh
MHR Lewis (US) LLC
Stamford, Connecticut
*Counsel for Plaintiff*

Steven A. Coploff
Steinberg & Cavaliere, LLP
White Plains, New York
*Counsel for Defendants*

Seibel, J.

Before the Court is the motion for summary judgment of Defendants Piero D'Ippolito and Cicinelli & D'Ippolito, CPA's, P.C., ("Cicinelli & D'Ippolito").  (Doc. 41.)

## I.    BACKGROUND

### A.    Facts

The following facts are based on Defendants' Local Civil Rule 56.1 Statement and Plaintiff's 56.1 Counterstatement and are undisputed unless otherwise noted.

#### 1.    The Parties

Defendant D'Ippolito is a certified public accountant ("CPA"), and Defendant Cicinelli & D'Ippolito is a firm that provides accounting services to its clients.  (Doc. 46 ("P's 56.1

Counterst.") ¶ 1.) Defendants provided accounting services to Sisemen, LLC ("Sisemen"), at least from 2007 through 2015. (*See id.* ¶¶ 2, 6-7.) Plaintiff Dale Pennington owned 25% of Sisemen, and non-party Kurt Wittek owned the other 75%. (*Id.* ¶ 2.) Sisemen's sole asset was a long-term leasehold on a piece of commercial property located in Norwalk, Connecticut (the "Sisemen Property"). (*Id.* ¶ 3.) Plaintiff states that D'Ippolito acted as Sisemen's "CFO/controller" as early as 2006. (*Id.* ¶ 2.)

### 2. The Loan

In or about 2007, unbeknownst to Plaintiff, Wittek caused Sisemen to take out a $9.4 million loan (the "Cherry Loan") from an entity called 365 Cherry, LLC ("Cherry"), for a purpose unrelated to Sisemen, and pledged the Sisemen Property as security for that loan. (*Id.* ¶ 4; Doc. 45 ("McHugh Decl.") Ex. 2 at 1-2.) Wittek defaulted on the Cherry Loan, and in 2011, Cherry foreclosed on the Sisemen Property, leaving Sisemen with no assets. (P's 56.1 Counterst. ¶ 5.)

From 2007 to 2009, D'Ippolito provided accounting services to Sisemen and was aware that funds were being wired into Sisemen's account as a result of the Cherry Loan and that those funds were immediately transferred out to Wittek. (*Id.* ¶ 6.) Defendants state that D'Ippolito did not account for those transfers because he did not know that Sisemen was the borrower and, to his knowledge, the transfers had no bearing on Sisemen's assets or liabilities. (*Id.*)[1] Plaintiff, however, disputes Defendants' assertions and states that D'Ippolito was or should have been aware that Sisemen was the borrower (if for no other reason than that the funds came in to Sisemen) and therefore the transfers would have a bearing on Sisemen's asset and liabilities.

---

[1] D'Ippolito testified that he was told the money came in to and went out of Sisemen as a "flow-through" to "keep things simple." (McHugh Decl. Ex. 3. at 52:10, 16.)

2

(*Id.*; Doc. 44 ("P's Opp.") at 15.)  Plaintiff's expert opines that D'Ippolito should have recorded the Cherry Loan as a liability of Sisemen, but that instead he treated the incoming funds as increases in Wittek's capital account and the outgoing funds as corresponding reductions, and that the latter should have been recorded as a loan to Wittek.  (McHugh Decl. Ex. 7 ("Plude Report") at 7-8.)[2]  Plaintiff testified that he got quarterly statements from D'Ippolito showing Sisemen's assets, loans, and distributions, (McHugh Decl. Ex. 1 at 25:8-21), and they apparently did not mention the Cherry Loan.

From 2011 to 2015, D'Ippolito continued to prepare Sisemen's tax returns and K-1s and continued to recognize amortization in the value of the Sisemen Property.  (P's 56.1 Counterst. ¶ 7.)  It is undisputed that throughout those years, the tax returns and K-1s that D'Ippolito prepared did not accurately reflect Sisemen's financial position; the entire asset should have been written off in 2011 and not appeared on the documents in the subsequent years.  (*See id.* ¶ 10.)  But the parties dispute when D'Ippolito learned that the Sisemen Property no longer belonged to Sisemen, and therefore there is a dispute as to whether D'Ippolito should have known that the asset should have been written off.  (*Id.* ¶¶ 6-8, 10.)[3]

### 3.     **The Arbitration**

In 2015, Plaintiff commenced an arbitration against Wittek.  (*Id.* ¶ 8.)  Plaintiff claimed that Wittek defrauded him by stripping Sisemen of its sole asset and leaving Plaintiff's interest in

---

[2] On the Sisemen balance sheet, the incoming transactions were shown as "365 Cherry Loan advances" and the outgoing payments as "365 Cherry Loan draws" under the heading "Equity - 365 Loan ("Kurt").  (Plude Report Ex. 3 at 3.)  Plaintiff notes that D'Ippolito did not explain why a loan having nothing to do with Sisemen would be on its books.  (P's Opp. at 5-6.)

[3] Plaintiff notes that during this period, Defendants were recognizing the amortization of the Sisemen Property but had stopped showing either the mortgage payments on the property or real estate taxes paid.  (P's Opp. at 6-7 (citing McHugh Decl. Exs. 4-5).)

3

Sisemen worthless. (*Id.*) Defendants state that it was "at that time," in 2015, "that D'Ippolito first learned what had happened to Sisemen's sole asset." (*Id.*) Plaintiff contends that D'Ippolito knew earlier than 2015. (*See id.*)

After holding evidentiary hearings, including taking testimony from D'Ippolito, the arbitrator ruled in favor of Plaintiff and awarded him a judgment of more than $1.1 million. (*Id.* ¶¶ 9, 11; Doc. 41 Ex. C ("Corrected Interim Award") at 1, 11.) The arbitrator found that Wittek breached a fiduciary duty he owed to Plaintiff and Sisemen; breached his contract with Plaintiff; impermissibly engaged in self-dealing and corporate waste; and violated the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. §§ 42-110a *et seq.*[4] (Corrected Interim Award at 6, 9.) The arbitrator found that there was insufficient evidence that Plaintiff was aware of the circumstances surrounding the Cherry Loan, its default, the foreclosure on the Sisemen Property, and the subsequent measures taken by Wittek to have been able to address the repercussions of the loan. (*Id.* at 7.) The arbitrator added, "Indeed, to this day, the tax returns continue to reflect that the property remains within the ownership of Sisemen, LLC because even Sisemen's accountant [D'Ippolito] did not know otherwise until last year." (*Id.* at 7-8.)

In addition to the aforementioned reference to D'Ippolito, the arbitrator made the following comments about him: (1) "the company's accountant, Piero D'Ippolito, who reviewed its books and records every quarter and prepared its tax returns, was not aware of the loan default"; (2) "the company's accountant, and later bookkeeper . . . , D'Ippolito, was not aware of [the mortgage for the loan or the Stipulation and Certificate of foreclosure that were publicly filed]"; (3) "tax returns continued to be filed after 2011 apparently because D'Ippolito assumed

---

[4] The arbitrator noted that "although CUTPA would not normally apply to intracompany disputes, Wittek's actions here involved self-dealing decisions he made to support other of his endeavors, decisions which he concealed from Pennington." (Corrected Interim Award at 9.)

4

that the property was continued to be owned by Sisemen and therefore the parties were entitled to continued depreciation on their K-1s"; and (4) that as of early January 2011, D'Ippolito, "through ignorance," continued to deem Sisemen in operation despite it having no assets. (*Id.* at 3, 5-6, 9.)

To date, Plaintiff has been unable to collect on his arbitral award against Wittek. (P's 56.1 Counterst. ¶ 9.)

### B. Procedural History

Plaintiff initiated this action on June 27, 2018, and filed his Complaint on June 28, 2018. (Doc. 5.) Defendants answered on August 23, 2018. (Doc. 18.) On September 18, 2018, I granted Plaintiff leave to amend, (Minute Entry dated Sept. 18, 2018), and Plaintiff filed his First Amended Complaint on October 19, 2018, bringing the following claims against both Defendants: (1) professional negligence; (2) negligence; (3) breach of fiduciary duties; (4) aiding and abetting breach of fiduciary duties; (5) fraud; (6) aiding and abetting fraud; (7) unfair trade practices under CUTPA; (8) aiding and abetting unfair trade practices under CUTPA; and (9) deceptive acts and practices under New York General Obligation Law ("NYGBL") §§ 349, *et seq.*, (Doc. 25 ¶¶ 38-87). Defendants answered three days later. (Doc. 26.)

On March 5, 2019, Defendants filed a pre-motion letter, (Doc. 35), Plaintiff responded on March 11, 2019, (Doc. 36), and I held a pre-motion conference on March 18, 2019, (Minute Entry dated Mar. 18, 2019). The parties attempted to mediate following that conference, but after that attempt was unsuccessful, the parties filed their motion papers on July 15 and 16, 2019. (*See* Docs. 41-47.)

5

## II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . .

admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). Where an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." *Id.* 56(c)(4); *see DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012). In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

### III. DISCUSSION

#### A. Negligence Claim

Defendants first argue that Plaintiff's professional negligence (or malpractice) claim and negligence claim are redundant, and therefore the latter must be dismissed. (*See* Doc. 42 ("Ds' Mem.") at 6.) Plaintiff responded that he should be permitted to plead theories of liability in the alternative, especially considering "'the hybrid nature of professional malpractice claims'" that could sound in both negligence and contract law. (P's Opp. at 9 (quoting *Buchwald v. Renco Grp., Inc.*, (*In re Magnesium Corp. of Am.*), 399 B.R. 722, 754 (S.D.N.Y. Bankr. 2009).) But it is well settled that negligence claims that are based on the same allegations and seek the same relief as malpractice claims "must be dismissed as duplicative." *Paladini v. Capossela, Cohen, LLC*, No. 11-CV-2252, 2012 WL 3834655, at *5 (S.D.N.Y. Aug. 15, 2012), *aff'd*, 515 F. App'x 63 (2d Cir. 2013) (summary order); *see Meador v. Albanese Law Office*, No. 08-CV-562, 2010 WL 3807163, at *4 (N.D.N.Y. Sept. 23, 2010) (collecting S.D.N.Y. and New York state cases).[5]

---

[5] New York law applies because that is where Defendants were licensed and had their principal place of business, *see GlobalNet Financial.Com, Inc. v. Frank Crystal & Co.*, 449 F.3d

7

Accordingly, Plaintiff cannot maintain both a professional negligence claim and a negligence claim, and the latter is dismissed.

### B. Accounting Malpractice

To establish an accounting malpractice claim, "the injured party must show: (1) the accountant's conduct fell below the accepted standard of practice; and (2) the accountant's conduct was a proximate cause of the alleged injuries." *Paladini*, 2012 WL 3834655, at *3; *see Bankr. Servs., Inc. v. Ernst & Young* (*In re CBI Holding Co.*), 419 B.R. 553, 568-69 (S.D.N.Y. 2009) ("To prevail on a claim under New York law for auditor malpractice, a plaintiff must establish (1) that there was a departure from accepted standards of practice; and (2) that the departure was a proximate cause of injury."), *on reh'g in part*, No. 01-CV-0131, 2010 WL 2287013 (S.D.N.Y. June 7, 2010).

#### 1. Standard of Care

Defendants argue that Plaintiff's negligence claim fails because Plaintiff's expert expressly disclaimed reaching any conclusion as to whether Defendants were negligent, and on a summary judgment motion, Plaintiff is required to use expert testimony to establish professional negligence. (Ds' Mem. at 7.) Indeed, "[e]xpert testimony is normally required to establish the applicable standard of practice and, in an appropriate case, to determine whether an alleged deviation from that standard was the proximate cause of a plaintiff's injuries." *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 343 (S.D.N.Y. 2005). And "[i]n accounting malpractice cases, in which a mere negligence standard could be sufficient to establish liability,

---

377, 385 (2d Cir. 2006), and, in any event, because both parties rely on New York cases in their briefs, (*see* Ds' Mem. at 4 (citing New York cases); P's Opp. at 10 (same)), they "appear to agree that New York law governs," *Pearson v. Walden Univ.*, 144 F. Supp. 3d 503, 508 (S.D.N.Y. 2015).

expert testimony is typically required." *In re Puda Coal Sec. Inc., Litig.*, 30 F. Supp. 3d 230, 249 (S.D.N.Y. 2014), *aff'd sub nom. Querub v. Hong Kong*, 649 F. App'x 55 (2d Cir. 2016) (summary order). But Defendants' cases show only that expert testimony is required to establish the applicable standard of care, *see id.* at 249 (collecting cases that hold it is expert's duty to establish applicable standard of care in professional negligence actions), not that an expert is required to establish that a deviation from that standard in fact occurred – a question that is typically reserved for the jury, *see, e.g.*, *Rubens v. Mason*, 387 F.3d 183, 189 (2d Cir. 2004) ("The questions to be resolved by the fact-finder in the . . . malpractice action, therefore, are whether the [professional] fell below the applicable standard of care.").

But even if Plaintiff's expert were required to establish that Defendants deviated from the professional standard of care, Plaintiff's expert did just that. (*See, e.g.*, Plude Report at 7 ("The proper accounting treatment of the Cherry Loan under generally accepted accounting principles would require the Cherry Loan to be recorded as a liability," but Defendants engaged in "improper accounting treatment"); *id.* at 8 ("The deposit of the wire transfer was never recorded as a deposit into the Sisemen checking account, a procedure required under normal bookkeeping practices."); *id.* ("The proper accounting treatment of the funds transferred out to the undisclosed Wittek Company should have been an entry of an intercompany loan to the undisclosed company or a loan to Wittek. Neither occurred. Rather the transaction was incorrectly recorded as a capital distribution of Wittek."); *id.* ("The withdrawal from the checking account of Sisemen was never recorded as a disbursement as would be required under normal bookkeeping practices.").) Accordingly, the record as a whole, including Plaintiff's expert's testimony regarding both the appropriate standard of care and whether Defendants deviated from that standard, is sufficient to make it to a jury on those questions.

9

### 2. Causation

Plaintiff is also required to establish proximate cause. To do so, "the plaintiff must prove (1) that the defendant's malpractice actually caused the plaintiff's injury; and (2) that the injury was a foreseeable consequence of the malpractice." *In re CBI Holding Co.*, 419 B.R. at 568-69. "Questions of causation are ordinarily reserved for a finder of fact, and on a motion for summary judgment the moving party bears the burden of showing that no issues of material fact exist and that it is entitled to judgment as a matter of law." *MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*, 199 F. Supp. 3d 818, 841 (S.D.N.Y. 2016) (collecting cases). A court, however, "may decide that a reasonable jury can reach only one conclusion, and decide the issue [of causation] as a matter of law." *Perrin v. Hilton Int'l, Inc.*, 797 F. Supp. 296, 299-300 (S.D.N.Y. 1992).

Many accounting malpractice cases bring up thorny causation issues because, as is the case here, the accountant is alleged to have failed to notice an issue caused by someone other than the accountant himself, and the accountant argues that the underlying issue, not the accountant's conduct, was the proximate cause of the plaintiff's damages. Here, Defendants argue that it was not their malpractice, but rather the conduct of Wittek, that caused Plaintiff's damages, and therefore Plaintiff has failed to establish causation. To that end, Defendants cite to *Paladini, LLC*, 515 F. App'x at 65. Even more helpful to Defendants, however, is the underlying district court case in *Paladini*, in which then-Chief Judge Loretta Preska addressed proximate cause as applied to accounting malpractice actions. *See Paladini*, 2012 WL 3834655, at *4. Judge Preska laid out two ways that a plaintiff can establish causation where damages were initially brought about by another party's actions, but the accountant failed to account for those damages, and in doing so, deviated from the applicable professional standard of care. First,

plaintiff can establish proximate cause if he "affirmatively acted on the defendant's alleged erroneous [accounting documents] and assurances." *Id*. Second, a plaintiff can establish proximate cause if he can show that had the documents been correctly prepared, the plaintiff would have been able to mitigate his damages.

Here, there is no evidence that Defendants knew of the Cherry Loan before Wittek took it out or otherwise are responsible for that transaction; rather, they are alleged to have failed to flag it or properly account for it once the money started coming in to and going out of Sisemen. Plaintiff has failed to "point to any conduct that he undertook in reliance" on the tax returns, quarterly statements, and K-1s prepared by Defendants. *Id.* Nor has Plaintiff provided facts from which a jury could conclude that accurate accounting documents would have allowed him to mitigate his damages. In fact, Plaintiff's only argument regarding proximate cause is the following:

> [T]here is ample evidence in the record to demonstrate Mr. Pennington suffered monetary harm proximately caused by the calculated acts and omissions (active concealment) of Mr. D'Ippolito. Mr. D'Ippolito concedes he knew about the Cherry Loan from its inception in 2007 (before the facility was drawn down in any meaningful way), acknowledges that the Cherry Loan funds came into the LLC account of Sisemen (a clear indication that Sisemen is the borrower), he never informed Mr. Pennington of the liability and, indeed, actively concealed the liability by providing quarterly reports at Mr. Pennington's request which did not reflect the Cherry Loan in any way.

(P's Opp. at 15.) This conclusory statement, without more, falls short of establishing proximate cause.[6]

Plaintiff does not connect Defendants' actions to any specific damages. He does not explain what losses were caused by the inaccurate tax returns, quarterly statements, or K-1s, nor

---

[6] Plaintiff's treatment of proximate cause is surprising, considering that Defendants raised the issue of causation in both their pre-motion letter, (Doc. 35 at 2), and their motion, (Ds' Mem. at 6-8), yet "Plaintiff glosse[d] over this critical issue in one paragraph," (Doc. 47 at 5).

11

does he explain how the damages could have been avoided had Defendants properly accounted for the loan. In short, Plaintiff has failed to point to evidence from which one could conclude that his damages were caused by Defendants, rather than Wittek.

But the Court has dug into the record to determine if there are facts from which a reasonable jury could find that those damages could have been avoided had Defendants performed up to the standard of care. Exhibits to Plaintiff's expert report show that the first drawdown on the Cherry Loan was $2.1 million on July 1, 2007. (Plude Report Ex. 4.) By that time Cherry already had a mortgage on the property that was Sisemen's sole asset. (McHugh Decl. Ex. 2 at 2; *see* P's 56.1 Counterst. ¶ 4.) Assuming, as Plaintiff's expert opines, that Defendants improperly accounted for those transactions, the first time they would have come to Plaintiff's attention was in the first quarterly report thereafter, which would have been prepared some time after September 30, 2007. By that time almost $5 million had been drawn down. (Plude Rep. Ex. 4). Plaintiff has not pointed to anything in the record showing, or otherwise suggested, that at that point Plaintiff could have done anything to unwind the Cherry Loan, unencumber the mortgaged property, or otherwise get his money out, and there is no reason to believe he could have done so. In other words, the damage was done before any failure by Defendants to properly account for the transactions.[7] Indeed, even if Defendants had informed Plaintiff of the Cherry Loan immediately upon the first drawdown, Plaintiff has not suggested how he would have been able to rescue his investment. *See In re CBI Holding Co.*, 419 B.R. at 569 (to show proximate cause where wrongful act is failure to perform duty, causation is shown

---

[7] The other failures identified by Plaintiff's expert relate to events in 2011 and thereafter, (*see* Plude Report at 4-6), well after Sisemen's sole asset had been foreclosed upon, so while those errors may be said to have delayed Plaintiff's discovery of his loss, they cannot be said to be a proximate cause of it.

12

where performance of duty would have prevented harm and harm was reasonably foreseeable result of dereliction). To find a fact issue as to proximate cause on this record would amount to sheer speculation. *See Perkins v. Norwick*, 693 N.Y.S.2d 1, 3 (App. Div. 1999) (no causation where plaintiff's damages allegations are "couched in terms of gross speculation," alleging what they "might" or "would" have done), *order issued*, 1999 WL 391079 (App. Div. June 16, 1999); *see also Icahn v. Todtman, Nachamie, Spizz & Johns, P.C.*, No. 99-CV-11783, 2001 WL 1160582, at *8 (S.D.N.Y. Oct. 1, 2001) (speculation regarding what would have happened is insufficient to show malpractice caused damages) (collecting cases).

Accordingly, I find that Plaintiff has failed to identify a genuine dispute as to whether Defendants proximately caused Plaintiff's damages, and Defendants are entitled to summary judgment on Plaintiff's professional negligence claim.

### C. Breach of Fiduciary Duty and Fraud

Defendants next argue that they are entitled to summary judgment on Plaintiff's claims for breach of fiduciary duty and fraud, and aiding and abetting the same. Specifically, Defendants argue that the claims are duplicative of Plaintiff's professional negligence claim. (Ds' Mem. at 8.) Plaintiff does not address this argument in his opposition.

"Causes of action for . . . breach of fiduciary duty are duplicative of professional malpractice causes of action where they are based on the same factual allegations and seek similar damages." *Delphi Healthcare PLLC v. Petrella Phillips LLP*, 72 N.Y.S.3d 269, 272 (App. Div. 2018) (collecting cases); *see MIG, Inc. v. Paul, Weiss, Rifkind, Wharton & Garrison, L.L.P.*, 701 F. Supp. 2d 518, 532 (S.D.N.Y. 2010) (same), *aff'd*, 410 F. App'x 408 (2d Cir. 2011) (summary order). The same is true for fraud claims. *See Tasseff v. Nussbaumer & Clarke, Inc.*, 747 N.Y.S.2d 621, 622 (App. Div. 2002) ("Where, as here, a fraud claim is asserted in

13

connection with charges of professional malpractice, it is sustainable only to the extent that it is premised upon one or more affirmative, intentional misrepresentations which have caused additional damages, separate and distinct from those generated by the alleged malpractice.") (internal quotation mark and alteration omitted); *MIG, Inc.*, 701 F. Supp. 2d at 533 (same). Here, all of Plaintiff's claims stem from the same underlying conduct – that is, Defendants' alleged concealment of the loan – and seek the same damages.

Plaintiff, by not addressing Defendants' argument that his breach of fiduciary duty and fraud claims are duplicative of his malpractice claim, gives me no reason to depart from the well-settled law requiring dismissal of such claims. Accordingly, Plaintiff's breach of fiduciary duty and fraud claims are dismissed, and because Plaintiff's aiding and abetting claims "require the existence of a primary violation," *Weshnak v. Bank of Am., N.A.*, 451 F. App'x 61, 62 (2d Cir. 2012) (summary order), Plaintiff's aiding and abetting claims are also dismissed.[8]

### D. State Law Claims

Defendants next move for summary judgment on Plaintiff's three state law claims (two under CUTPA and one under NYGBL).

#### 1. CUTPA

"While a private cause of action may be maintained under CUTPA, it must demonstrate some nexus with the public interest and not involve a purely private dispute." *Fortini v. New Eng. Log Homes, Inc.*, 4 Conn. App. 132, 136-37 (1985); *see Sportsmen's Boating Corp. v. Hensley*, 192 Conn. 747, 755 (1984) ("In a private dispute a plaintiff may recover for CUTPA violations only if the proven deceptive acts or practices of the defendant have a potential effect

---

[8] Because I am dismissing these claims as duplicative, I need not address Defendants' other arguments regarding these claims.

on the general consuming public.") (internal quotation marks omitted); *Red Law Firm, LLC v. Webster Bank*, No. 12-CV-6029913, 2013 WL 3766829, at *3 (Conn. Super. Ct. June 25, 2013) (same).  Additionally, "professional malpractice does not give rise to a cause of action under CUTPA." *Beverly Hills Concepts, Inc. v. Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 79 (1998); *see Cooke v. Williams & Pattis*, No. 99-CV-2223, 2002 WL 32509019, at *8 (D. Conn. Aug. 27, 2002) ("It is well established that professional malpractice does not give rise to a cause of action pursuant to CUTPA."), *aff'd sub nom. Cooke ex rel. Cooke v. Williams & Pattis*, 97 F. App'x 362 (2d Cir. 2004) (summary order); *Suffield Dev. Assocs. Ltd. P'ship v. Nat'l Loan Inv'rs, L.P.*, 260 Conn. 766, 781 (2002) ("Accordingly, . . . we conclude that professional negligence – that is, malpractice – does not fall under CUTPA.").

Defendants argue that CUTPA does not apply here because this dispute is a purely private one that does not impact consumers at large and because Plaintiff's suit is for professional malpractice, which is not covered by the statute.  (Ds' Mem. at 11-12.)  Plaintiff does not directly address either of Defendants' arguments.  Rather, Plaintiff argues at length that CUTPA is a remedial statute that should be construed broadly.  (P's Opp. at 19-21.)  But Plaintiff's argument does not refute Defendants' assertion, supported by overwhelming case law, that Plaintiff's complaint regarding a private dispute that does not implicate the general consumer public is beyond the scope of CUTPA.  Further, Plaintiff has not offered any justification as to why this case requires a departure from the rule that professional negligence does not give rise to a cause of action under CUTPA.  Accordingly, Defendants are entitled to summary judgment on Plaintiff's CUTPA claims.

### 2. NYGBL

"A successful GBL § 349 claim requires that a plaintiff prove, by a preponderance of the evidence, that (1) the defendant has engaged in an act or practice that is deceptive or misleading in a material way; (2) the plaintiff has been injured by reason thereof; and (3) the deceptive act or practice is consumer oriented." *Koch v. Greenberg*, 14 F. Supp. 3d 247, 261 (S.D.N.Y. 2014) (internal quotation marks omitted), *aff'd*, 626 F. App'x 335 (2d Cir. 2015) (summary order).

Defendants argue that Plaintiff's NYGBL claim must be dismissed because it stems from a purely private dispute that does not have "an impact upon consumers at large," and therefore is not consumer oriented. (Ds' Mem. at 11.) Plaintiff's opposition does not address this argument. Rather, Plaintiff devotes the entire section under the heading, "New York Deceptive Acts and Practices," to a choice-of-law analysis. (*See* P's Opp. at 23-24.) But choice-of-law questions are not relevant here. Defendants did not argue that there was anything improper in Plaintiff bringing causes of action under both New York and Connecticut statutes. Rather, Defendants argue that Plaintiff does not have a claim under either statute because neither statute covers purely private conduct. I agree.

Defendants cite to numerous cases in which New York courts dismissed NYGBL claims because they were private in nature and did not affect consumers at large. (Ds' Mem. at 12 (citing *Air & Power Transmission, Inc. v. Weingast*, 992 N.Y.S.2d 46, 48-49 (App. Div. 2014) (dismissing NYGBL claim where "the conduct complained of was not consumer-oriented, as it did not affect consumers at large"); *Cathy Daniels, Ltd. v. Weingast*, 936 N.Y.S.2d 44, 48 (App. Div. 2012) ("The motion court's dismissal of the GBL § 349 cause of action was proper. The complaint contains insufficient allegations of a broad impact on consumers at large."); *Denenberg v. Rosen*, 897 N.Y.S.2d 391, 396 (App. Div. 2010) (dismissing NYGBL claim that

16

was "essentially a private dispute among the parties relating to advice that plaintiff received and his particular plan structure, rather than conduct affecting the consuming public at large.")).) This principle has been applied to claims against accountants. *See Sherman v. Mulerman*, 7 N.Y.S.3d 245, 2014 WL 6673912, at *8 (Sup. Ct. 2014) (unpublished table decision) ("conduct was a private transaction between [the accountant-defendant] and [the plaintiff], and cannot be construed as having a broad impact on consumers at large so as to fall within the ambit of General Business Law § 349, and there is no indication of any actual damage to the public as a result"). Here too the dispute is purely private in nature and has no effect on the public at large – and Plaintiff has not argued or presented any facts to the contrary. Accordingly, Plaintiff's NYGBL claim is dismissed.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the pending motion, (Doc. 41), enter judgment in favor of Defendants, and close the case.[9]

**SO ORDERED.**

Dated: December 2, 2019
White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.

---

[9] The Clerk of Court should also terminate Defendants' pre-motion letter. (Doc. 35.)